THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN BARNA,                              :
                                         :
            Plaintiff,                    :
                                         :
      v.                                 :        3:12-CV-638
                                         :        (JUDGE MARIANI)
BOARD OF SCHOOL DIRECTORS                :
OF THE PANTHER VALLEY                    :
SCHOOL DISTRICT, et al.,                 :
                                         :
            Defendants.                   :

## MEMORANDUM OPINION

Before the Court are the cross-motions for summary judgment of the Defendants,

Board of School Directors of the Panther Valley School District, and Plaintiff, John Barna

(Docs. 49, 77). For the reasons that follow, the Court finds that the permanent ban imposed

by Defendants upon Barna prohibiting him from attending public school board meetings of

the Board of School Directors of the Panther Valley School District and from entering upon

the property of the School District violates Barna's free speech rights under the First

Amendment. The Court also finds, however, that Barna's constitutional right to be free of a

permanent ban on attending and speaking at School Board meetings was not clearly

established at the time of the events which gave rise to this suit and that accordingly, the

Defendants are entitled to qualified immunity. Thus, summary judgment will be entered in

favor of the Defendants.

## I. PROCEDURAL HISTORY

Plaintiff, John Barna, filed a Complaint (Doc. 1) in this case on April 5, 2012 and an

Amended Complaint the following day (Doc. 2). Plaintiff's Amended Complaint against

Defendants alleged violations of his First Amendment right to free speech pursuant to 42

U.S.C. §§ 1983 and 1988 (Count I) and violations of his First Amendment and Fourteenth

Amendment rights to be free from unconstitutional prior restraint pursuant to 42 U.S.C. §§

1983 and 1988 (Count II). (Doc. 2)

On October 15, 2013, the Court denied Defendants' Motion for Judgment on the

Pleadings (Doc. 22) and denied without prejudice the individual defendants' request for

qualified immunity (Docs. 28, 29). As a result, Defendants filed a Motion for Summary

Judgment on January 28, 2014 (Doc. 49). In November of 2014, this Court referred the

Defendants' Motion for Summary Judgment to Magistrate Judge Carlson for the preparation

of a Report and Recommendation ("R&R"). The Magistrate Judge submitted the R&R (Doc.

66) on January 26, 2015, recommending that the Court grant Defendants' motion, to which

Plaintiff timely objected (Docs. 67, 68). Defendants did not file a response to the Plaintiff's

Objections.

In previously denying Defendants' motion for judgment on the pleadings, the Court

stated that:

> there is a serious and substantial question in the undersigned's mind as to
> whether a permanent ban on Plaintiff's attendance at all future Panther Valley
> School Board meetings and Panther Valley school property was "narrowly
> tailored" to serve the undoubtedly compelling government interest in assuring

2

the safety of other citizens in attendance at School Board meetings and on school property.

(Doc. 28, at 11). Defendants recognized this concern in their brief in support of their motion for summary judgment, but without reference to any case law wherein a Court had upheld a similar permanent ban and stated only that their actions in banning Barna were the "least restrictive, narrowly tailored way of insuring the safety and welfare of the public and District officials, and maintaining order at Board meetings." (Doc. 50, at 10-11). Plaintiff's brief in opposition to summary judgment (Doc. 51) did not address this Court's aforementioned concern at all and failed to specifically discuss the Constitutional issues that are present as a result of the imposition of a permanent ban. The Magistrate Judge's R&R also did not address this specific issue.[1]

Thus, this Court by Order dated March 2, 2015 (Doc. 69) required the parties to submit supplemental briefs "setting forth authority on the limited issue of whether a

_____

[1] The Court adopts Magistrate Judge Carlson's R&R, and particularly its finding that: Barna has not pointed to any probative evidence from which a jury could find that the Board's decision to oust him from further meetings after his October 2011 conduct was impermissibly based on viewpoint discrimination; to the contrary, the only evidence in the record is that the decision was based on the Board's finding that Mr. Barna had repeatedly and impermissibly abridged the rules of decorum and hijacked the legitimate business of the Board, and his behavior in this limited public forum had become intolerably disruptive. (Doc. 66, at 28). However, since the R&R did not reach the issue of the legality of the permanent ban imposed on Barna from attending and speaking at School Board meetings, the Court finds it necessary to supplement the R&R to address that issue. To that end, this Court directed the submission of supplemental briefs on the issue as well as granted the request of Defendants' counsel for oral argument. Plaintiff was also permitted to file a motion for summary judgment after the issuance of Magistrate Judge Carlson's R&R, which has now been fully briefed. Plaintiff's motion addresses the issue of his permanent ban as described above. In adopting the Magistrate Judge's R&R, the Court makes clear that the Plaintiff's permanent ban is the only issue before it and counsel for the parties, in turn, acknowledged the absence of any disputed material facts on this issue at oral argument so that this matter may be properly resolved on the basis of the parties' respective motions for summary judgment.

3

permanent ban on attendance and speech such as that imposed on the Plaintiff in this case

can ever be considered sufficiently narrowly tailored to serve a significant or compelling

government interest and thereby avoid a violation of Plaintiff's free speech rights under the

First Amendment." (*Id.* at 3).

Supplemental briefs were filed by Plaintiff and Defendants (Docs. 72, 73). Further,

the Defendants requested oral argument on the limited issue of the constitutionality of a

permanent ban on attendance and speech (Doc. 73-1), a request that this Court granted on

March 30, 2015 (Doc. 74).

Oral argument was held before the Court on April 10, 2015.

At oral argument, the parties agreed there are no disputes of material fact in this

case and that the issue to be resolved was a question of law with respect to the

constitutionality of the permanent ban imposed upon Barna and the related claim of the

Defendants of qualified immunity. (Off. Tr. of Oral Arg., at 24, 26).

Barna filed a Motion for Summary Judgment on April 28, 2015. (Doc. 77). That

motion has been fully briefed and is now ripe for disposition along with the Motion for

Summary Judgment filed by Defendants.

## II. STATEMENT OF UNDISPUTED FACTS

As noted, at oral argument, counsel for the parties agreed that there was no genuine

dispute of material fact so that the case was appropriately to be decided on cross-motions

4

for summary judgment. That Barna's behavior at successive School Board meetings was

inappropriate was conceded by Barna's counsel in the following exchange with the Court:

> The Court:  You're not suggesting that Mr. Barna's behavior was appropriate,
> when he threatened Hiles or Markovich to fight, or uttered the words, "son of
> a bitch", or when he engaged in aggressive posturing, as if he were willing to
> fight, when he carried on and was not allowed back into the room by Jeff
> Ruzicka, you're not going to tell me any of that is appropriate.
>
> Mr. Marchalk:  No, I wouldn't.

(Off. Tr. of Oral Arg., at 19).

Indeed, Magistrate Judge Carlson, in his R&R, noted that:

> [T]he defendants have now offered substantial evidence to show that on
> numerous occasions, Barna engaged in conduct that included making
> comments that multiple people believed were threatening; cursed in the
> presence of students who were in attendance; got into, or nearly got into,
> physical altercations with Board members and Jack Ruzicka, a security guard
> in attendance at Board meetings; persistently interrupted the Board's conduct
> of its business; and even invited a Board member to fight during the October
> 2011 meeting, which seems to have been the last straw for the Board.

(Doc. 66, at 25).

Counsel for the parties, at oral argument, agreed there were no other disputed

issues of material fact:

> The Court:  . . . [D]o either of you think that there are disputed issues of fact
> or is that a -- is this a matter that you think should properly be resolved on
> summary judgment?
> There's a motion for summary judgment, a recommendation by [Magistrate
> Judge] Carlson, but what are your views?  Are there issues of material fact
> that you want to try?  You can take your pick as to who answers first.
>
> Mr. Kozlowski:  I'm happy to answer that.  I don't believe there are any issues
> of material fact.  I think the facts are quite clear and speak for themselves.

Mr. Marchalk: I tend to agree, your Honor, interestingly enough. Obviously, you're going to have to rule on the Defendants' motion for summary judgment, and we can appeal it, if you choose not to find in [our] favor. We intend to file motions for summary judgment because, again, we are dealing with Constitutional issues, I don't think the facts are in dispute, I think it's a matter of law.

(Off. Tr. of Oral Arg., at 24).

Further, counsel agreed that a school district school board meeting is considered a

"limited public forum." (*Id.* at 4). Likewise, Defendants' counsel acknowledged that the ban

placed upon Barna which prohibits him from attending and speaking at School Board

meetings as well as entering upon the property of the Panther Valley School District is a

permanent ban:

> The Court: . . . So my problem is, what the school board did here, Mr. Kozlowski, is they banned this guy, Mr. Barna, forever, am I correct? There isn't any doubt here that if I were to let this stand, John Barna will never come to a school board meeting again?
>
> Mr. Kozlowski: Correct, based on the decision of -- the unanimous decision of the board, that is correct, they've passed a resolution instructing the Superintendent to instruct Mr. Barna that he's no longer permitted to come to school board meetings. But to say, never -- at some point in the future, could the board change its mind? Sure. Could a new board come in? Sure. I'm not advocating that's a reason why the Court should grant a decision today, but to speak in such words as never --
>
> The Court: But as it stands --
>
> Mr. Kozlowski: As it stands today, yes, a permanent ban. . . .

(*Id.* at 7-8).

And again, at the conclusion of oral argument the following exchange between the

Court and counsel took place:

> The Court:   I would have to find that an absolute ban on Mr. Barna's
> participation at the school board in person is reasonable.
>
> Mr. Kozlowski:  Correct.

(*Id.* at 33).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once such a showing has been made, the non-moving

party must offer specific facts contradicting those averred by the movant to establish a

genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S.

at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

7

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court

need consider only the cited materials, but it may consider other materials in the record."

Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-

moving party, and where the non-moving party's evidence contradicts the movant's, then

the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974

F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

In this case, the parties have filed cross-motions for summary judgment. According

to the Third Circuit:

8

Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). Each movant must

show that no genuine issue of material fact exists; if both parties fall to carry their respective

burdens, the court must deny the motions. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d

1007, 1023 (3d Cir. 2008). When reviewing each cross-motion, the court is still bound to

view the evidence in the light most favorable to the non-movant. Fed. R. Civ. P. 56; *United

States v. Hall*, 730 F. Supp. 646, 648 (M.D. Pa. 1990).

## IV. ANALYSIS

### A. John Barna's conduct at the April 8, 2010, April 22, 2010, October 12, 2011, and October 13, 2011 meetings of the Panther Valley School Board warranted action by the School Board to curtail Barna's obstreperous and disruptive conduct and to prevent his attempts to hijack the School Board's proceedings.

The undisputed facts in this case are recounted by Magistrate Judge Carlson in his

Report and Recommendation of January 26, 2015. (Doc. 66) The R&R chronicles the

events occurring at the School Board meetings of April 8 and April 22, 2010 as well as

October 12 and October 13, 2011.

Magistrate Judge Carlson set out the undisputed facts with respect to these

meetings. First, with regard to the April 8, 2010 meeting, Judge Carlson wrote:

> Apparently in an effort to curtail excessive debate during the time reserved for public comment, Mr. Markovich [the School Board President] advised Mr.

9

Barna that the public participation segment of a meeting was not an appropriate time to engage individual members of the Board in debate, but was instead a time to ask questions that could then be referred to the appropriate administrator for further answer. After being so advised, Mr. Barna proceeded to ask questions about a particular district contract with a firm named Schneider Electric, about which Mr. Barna was concerned, apparently because of its size or the cost. At one point, Mr. Barna said that he and some of his friends were confused by the contract and what they perceived to be a waste of public resources. In response, Mr. Markovich invited Mr. Barna to bring his friends to the next meeting, to which he responded, "You wouldn't like that. Some of my friends have guns." Barna claims that he was joking when he made this statement, and the record suggests that Mr. Markovich perceived it as such, since he responded "I'll have to wear my bullet proof vest." Mr. Barna recalls that those in attendance laughed at this exchange before the meeting broke up.

(Doc. 66, at 7-8) (internal citations omitted).

The School Board held another meeting on April 22, 2010 at which Mr. Barna was again in attendance. Magistrate Judge Carlson recounts the facts with respect to the events of that meeting as follows:

When he [Barna] arrived prior to the start of the meeting, Barna and Markovich had a discussion in the hall during which Markovich is claimed to have said, "Since you said that you have friends with guns, I'm going to have to ask you to leave." Barna expressed shock at this, and told Markovich he assumed he was joking. Markovich, however, was not joking: he told Barna that he could either leave the meeting voluntarily or he could be removed. Barna declined to leave on his own, and instead walked back into the meeting room. When the meeting commenced, Mr. Markovich stated on the record that because of the remark that Barna had made during the last meeting about having friends with guns, he was required to leave the meeting. Barna attempted to ask a question of the Board's solicitor, but was informed that he was unavailable and that Markovich was taking this action of his own accord, without a vote of the Board. Mr. Barna remembers that as he was preparing to leave the room, after debating his position for a little while, that at least two Board members were laughing at him, inspiring him to retort, "Don't laugh. I may have to come after all of yous." According to Mr. Barna, what he meant

10

by this was that he "was going to get even," or that he would have to "dig deeper" and "go through their files more closely." Others in attendance construed the remark as a threat.

Mr. Barna proceeded into the hallway, during which time he encountered another Board member, Dave Hiles. Mr. Barna attested that when he turned to face him, Mr. Hiles was "in a fighting position, his fists made," and that he then proceeded to make a series of gestures that Mr. Barna found to be directly threatening. After this encounter, Mr. Hiles returned to the Board meeting. Barna attempted to follow him but was physically restrained from doing so by a school guard, Jeff Ruzicka. Nevertheless, feeling that he was equipped "with extra strength that night," Mr. Barna forced his way back into the meeting "almost carr[ying the guard] back" as he did so.

(*Id*. at 8-9) (internal citations omitted).

As a result of the events of April 22, 2010, Panther Valley School District

Superintendent, Rosemary Porembo, issued a letter to Mr. Barna which stated:

In light of your conduct at several public Board meetings of the Panther Valley School District and on behalf of the Panther Valley Board of Education, please consider this as a warning that your disorderly conduct and making threats will not be permitted to continue. As a tax-paying citizen of Panther Valley you are welcome to come to public Board meetings and engage in a civil discourse regarding issues you may have with matters in the District, however, when you use threats toward Panther Valley School Board members or Administration, this type of conduct will not be permitted. Accordingly, you are hereby notified that should you appear at another public Board meeting at Panther Valley School District and threaten any Board member or Administrator, or become disorderly in any fashion, you will be barred from further attendance at public Board meetings of the Panther Valley School District. Please be guided accordingly.

(Letter of Superintendent Porembo to Barna Dated April 27, 2010, Doc. 50-4)

Mr. Barna thereafter continued to attend Board meetings and continued his efforts to

question the Board concerning the Schneider Electric Contract. (Dep. of Barna, at 26-28.)

11

Then, in the Fall of 2011, Barna attended a budget and finance meeting on October 12,

2011 and, as noted by Magistrate Judge Carlson, "blew [his] top" and got "carried away."

(Doc. 66, at 10-11 (quoting Dep. of Barna, at 30-31)).

During this meeting, the undisputed facts as set forth in the Report and

Recommendation issued by Judge Carlson are described as follows:

> During this meeting, Barna, by his own admission, repeatedly asked the
> meeting chair if he could ask questions, was denied the opportunity to do so,
> and then repeated this process every five minutes until finally, as he said, "I
> blew. I blew my top, I guess," and admittedly was "just mad." By this Barna
> meant that he raised his voice and became confrontational.

(*Id.*)

The record further shows that at this meeting, Barna claims that School Board

President Markovich eventually rose out of his chair, which Barna interpreted as an

invitation to fight. Barna says he responded, "Do you want to fight? Let's go." (*Id.* at 11).

At the October 13, 2011 School Board meeting, Mr. Barna again returned to press

his concern regarding the Schneider Electric contract. He filled out a form to speak at the

meeting and when called upon he issued an apology to some but not all of the Board

members in attendance at the previous meeting. During a recess in the meeting, Barna,

while leaving the meeting, admittedly uttered "son of a bitch" within ear shot of other

attendees possibly including students who were in attendance to receive an award. (*Id.* at

11-12).

On October 18, 2011, Robert Yurchak, Solicitor for the School Board, issued Barna a

letter informing him that as a result of his conduct the Board had determined he should be

barred from attending school functions and meetings. The letter states:

> Pursuant to direction by members of the Panther Valley School Board, I have
> been directed to notify you that on behalf of the Panther Valley School Board
> that you are hereby advised that you are not permitted to attend any further
> School Board meetings, any extracurricular events or be physically present
> on the campus of the Panther Valley School District for any reason effective
> immediately.      Your conduct has become intolerable, threatening and
> obnoxious. You are interfering with the function of the School Board and the
> School District as a whole. Consequently, you are no longer permitted on any
> Panther Valley School District property. By your own actions and conduct
> you have left the School Board with no alternative but to ban you from school
> property. Should you be found on any Panther Valley School District property
> you will be prosecuted to the fullest extent of the law.
>
> In the event that you should have reasonable and responsible questions for
> the School Board or the School District administration you are to submit them
> in writing to the Superintendent and she will see that you are provided with an
> appropriate reply in a timely fashion. . . .

(Letter from Attorney Yurchak to Barna dated October 18, 2011, Doc. 50-5).

The parties agree that the Panther Valley School District created a limited public

forum by its public school board meetings. "In contrast to traditional and designated public

forums, a governmental entity creates a limited public forum when it provides for 'a forum

that is limited to use by certain groups or dedicated solely to the discussion of certain

subjects.'" *Galena v. Leone*, 638 F.3d 186, 198 (3d Cir. 2011). "In limited public forums, to

avoid infringing on First Amendment rights, the governmental regulation of speech only

need be viewpoint-neutral and 'reasonable in light of the purpose served by the forum.'" *Id.*

The Court in *Galena* made clear that:

> The government may not "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995). The government, however, may restrict the time, place and manner of speech, as long as those restrictions are reasonable and serve the purpose for which the government created the limited public forum. *Pleasant Grove* [*City v. Summmum,* 555 U.S. 460, 129 S.Ct. 1125, 1132, 172 L.Ed.2d 853 (2009)]. A time, place, and manner restriction on speech is reasonable if it is (1) content-neutral, (2) narrowly tailored to serve an important governmental interest, and (3) leaves open ample alternatives for communication or information. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791-803, 109 S.Ct. 2746, 2753-60, 105 L.Ed.2d 661 (1989).

*Id.* at 199.

In this case, Plaintiff Barna's conduct was properly subject to some form of restriction as to time, place and manner of speech which to pass constitutional muster, must be unrelated to the content of his speech and must be "narrowly tailored to serve an important governmental interest" while at the same time allowing alternative ways for Barna to communicate the same information. *Galena, supra,* at 199. Here, there is no suggestion that the restrictions placed on Barna were related to the content of his speech. Instead, the record evidence shows the School Board's efforts to place restrictions on Barna were the result of his aggressive and disruptive behavior at School Board meetings.

In such circumstances, Barna's conduct warranted some form of action by the School Board. In this respect, Barna's conduct mirrors that of the Plaintiff in *Eichenlaub v. Township of Indiana*, 385 F.3d 274 (3d Cir. 2004). There, the Plaintiff, David Eichenlaub,

14

claimed that his First Amendment rights were violated when he was "limited in his right to

speak at a public meeting on September 14, 1999, and was removed from the same

meeting." 385 F.3d at 278. The Third Circuit affirmed the grant of summary judgment

against Eichenlaub on his restraint of speech and petition claims. In so ruling, it

summarized both Eichenlaub's conduct and the permissible purpose underlying the action

taken to remove him from the meeting:

> The record of the September 14, 1999 meeting discloses that he was
> repetitive and truculent, and that he repeatedly interrupted the chairman of
> the meeting. Restricting such behavior is the sort of time, place, and manner
> regulation that passes muster under the most stringent scrutiny for a public
> forum. Indeed, for the presiding officer of a public meeting to allow a speaker
> to try to hijack the proceedings, or to filibuster them, would impinge on the
> First Amendment rights of other would-be participants. We have no difficulty
> sustaining the decision to remove David Eichenlaub on that basis.

*Id.* at 281.

*Eichenlaub* was followed in *Olasz v. Welsh*, 301 F.App'x 142 (3d Cir. 2008). There,

Plaintiff Olasz was a member of the West Mifflin Borough Council. Defendant Welsh was

the President of that Council. At meetings in March and May of 2004, Welsh determined

that Olasz was "out of order" and instructed the police to remove him from the meeting.

Criminal complaints were filed against Olasz for his behavior at these meetings but those

charges were dismissed. Thereafter Olasz initiated a malicious prosecution suit under §

1983 alleging a violation of his First Amendment rights to free speech and free assembly.

The District Court granted summary judgment as to Olasz's First Amendment claims.

The Court found that restricting the disruptive behavior of Olasz "constitute[d] an

appropriate time, place, and manner regulation of a public forum." 301 F.App'x at 143.

The Court of Appeals affirmed the grant of summary judgment to Welsh. The Court

noted that in *Eichenlaub*, it

> addressed the issue of whether the "citizen's forum" portion of a city board of
> supervisors meeting was a public forum or a limited public forum. We noted
> that even the public discussion portion of the meeting was limited in scope to
> matters relating to the local government and that the meeting was not the
> equivalent of a traditional public forum such as a public street or park.

*Id*. at 145 (internal citation omitted). The Court continued:

> Against this backdrop, we determined that the plaintiff in *Eichenlaub* could not
> establish a First Amendment violation because restricting behavior that was
> "repetitive and truculent," and involved "repeatedly interrupt[ing] the chairman
> of the meeting," constituted "the sort of time, place, and manner regulation
> that passes muster under the most stringent scrutiny for a public forum."

*Id*.

The Court explained that in *Eichenlaub* it "ultimately concluded that the restrictions

imposed on the plaintiff derived from a 'perfectly sustainable and content-neutral desire to

prevent [the plaintiff's] badgering, constant interruptions, and disregard for the rules of

decorum." *Id*. Accordingly, the Court held that "[a]s in *Eichenlaub*, Welsh's actions at the

two Borough Council meetings to constrain Olasz's 'badgering, constant interruptions, and

disregard for the rules of decorum,' 385 F.3d at 281, constitute[d] appropriate time, place,

16

and manner regulations." *Id.* at 146. The Court found that Olasz suffered no First

Amendment violation which to base a claim for malicious prosecution under § 1983.

More recently, in *Mesa v. Hudson County Board of Chosen Freeholders*, 2011 WL

4592390 (D.N.J. 2011), the District Court granted the motions for summary judgment of the

defendants in a case in which plaintiff Mesa brought suit, alleging that his First Amendment

rights were violated when he was removed from a meeting of the Hudson County Board of

Chosen Freeholders after he had "insisted on speaking on a topic not under discussion and

then refused to sit down." 2011 WL 4592390 at *1. The District Court, following

*Eichenlaub, supra,* and *Olasz, supra,* found that Mesa was disruptive and combative:

> Mesa argues that he was not disruptive, but the record establishes otherwise.
> His assertions that he was silenced and "bullied" are belied by his own
> provocative words reflected in the transcript of the meeting. Mesa stood and
> accused the County Executive of exiting "like a bat out of hell," a comment
> that set the tone for his subsequent combative remarks. In response to
> Dublin, Mesa stated: "I am not going to tell you an item"; "I am not going to sit
> down. I want to speak"; "I am your boss"; and "You are going to get a suit, I
> am telling you. You are going to have to arrest me. Arrest me." These
> repeated outbursts are the kind of "truculent" and "disruptive" behaviors that
> justify removing a citizen from a public meeting to maintain order and
> decorum, *Jones v. Heyman*, 888 F.2d [1328, 1329 (11th Cir. 1989)], and to
> prevent a speaker from "hijacking" a meeting. *Eichenlaub*, 385 F.3d at 280-
> 81.

*Id.* at *6.

Under the case law of this Circuit, the Panther Valley School Board was clearly

justified in removing Barna from the April 22, 2010 School Board meeting and in notifying

him after the events that took place at the April 8 and April 22, 2010 School Board meeting

17

that his "disorderly conduct and making threats will not be permitted to continue" (Doc. 50-4). But undisputedly, the School Board did much more. After the events of the October 12 and 13, 2011 meetings, it directed its Solicitor to issue a letter to Barna on October 18, 2011 which informed him that he was "not permitted to attend any further School Board meetings, any extracurricular events or be physically present on the campus of the Panther Valley School District for any reason effective immediately." (Doc. 50-5). The Solicitor's letter warned Barna that if he were found on "any Panther Valley School District property" he would be "prosecuted to the fullest extent of the law." (*Id.*). The letter only offered Barna the opportunity to submit "reasonable and responsible questions" to the School Board in writing for which the Solicitor promised "an appropriate reply in a timely fashion" from the Superintendent. (*Id.*).

It is this Court's view that the School Board's response to Barna's admittedly inappropriate conduct was not sufficiently narrowly tailored to serve an important governmental interest and did not leave open ample alternatives for communication of information to or from Barna and as such placed an unreasonable restriction on Barna's speech in violation of the First Amendment. *See Galena,* 638 F.3d at 199.

Those courts that have confronted this issue in the context of a challenge to a prohibition on future expression because of past unlawful conduct have found such prohibitions unlawful. In *Cyr v. Addison Rutland Supervisory Union*, 60 F.Supp.3d 536 (D.Vt. 2014), the plaintiff brought suit alleging violations of the First and the Fourteenth

Amendments in response to the School District's issuance of two notices of trespass prohibiting him from entering onto its property. Plaintiff and his wife raised concerns about their son's education, who was diagnosed with an autism disorder. The staff of the Benson Village School, including its Director of Special Services and its Principal, were intimidated by Mr. Cyr who personally delivered his letters to the school on "nearly a daily basis." *Id.* at 540. Benson School officials testified that at some meetings between Cyr and the school staff concerning Mr. Cyr's son, "Cyr leaned over and spoke loudly with a clenched fist." *Id.*

Consistent with their efforts on behalf of their son, the Cyrs contacted the Benson school principal and "demanded to visit two days before school started, but she told Mr. Cyr they would have to wait until the day before school started." *Id.* Thereafter, Mr. Cyr engaged in activities which were perceived by school officials as threatening "in light of his repeated demands" to be allowed to visit the school before the commencement of the school year and his son's comments to a therapist expressing a desire to attack the principal with an ax, a statement which the therapist attributed to Cyr. *Id.* The Principal contacted the Fairhaven Police Chief for advice. He in turn made her aware that issuing a notice of trespass was an option and after consultation with Addison Rutland Supervisory Union Superintendent Ryan, the Principal issued a notice of trespass to Mr. Cyr. "The notice barred Mr. Cyr from all property owned by the ARSU for two years, the amount of time pre-printed on the notice." 60 F.Supp.3d at 540.

As a result of the issuance of the notice against trespass, Mr. Cyr could not attend the September Benson School Board meeting. The Principal then withdrew the notice against trespass on September 28, 2011. *Id*. at 541.

The dispute between Cyr and the Defendants with respect to Cyr's son's placement in the Benson school continued. The Cyrs, through the Vermont Legal Aid and Disability Law Project agreed to have a psychologist, Dr. Nancy Cotton, evaluate their son in connection with the attempts to reintegrate him into the Benson school. Dr. Cotton met with the school staff, reviewed the school's records of its communications with Mr. Cyr and spoke with Principal Doty and Director of Special Services Benway "regarding her concerns about Mr. Cyr's mental status and the potential risk he presented to school staff." *Id*. Because she became concerned for her own safety, Dr. Cotton decided not to meet with the Cyrs at their home or her office and would only meet at the Cyrs' lawyer's office. The Cyrs ultimately cancelled the interview. This prompted Dr. Cotton to tell Director Benway about Mr. Cyr's "escalating pattern of behaviors" and about a website attributed to Mr. Cyr that characterized teachers as "snakes" and offered that the "best way to deal with a snake is to remove the head." *Id*.

Dr. Cotton believed that the online comment quoted above was a "'serious threat in the context of dehumanizing people by comparing them to animals[,] which can further justify violence.'" *Id*. at 542. Because she believed that Mr. Cyr might pose a danger to the school staff, she warned the school of her belief that Mr. Cyr posed a danger and

recommended that a mental health risk assessment be conducted to determine Mr. Cyr's mental status.

As a result, the Benson School Superintendent issued a second notice against trespass on March 26, 2012 to Mr. Cyr based on Dr. Cotton's letter and consultation with Director Benson and Principal Doty. The notice again barred Mr. Cyr from all ARSU property for two years, a period of time preprinted on the Fairhaven police form. The ARSU also "offered Mr. Cyr the ability to attend school board meetings via telephone or through the use of various 'assistive technologies'." *Id.* Consequently, Mr. Cyr did not attend several School Board meetings which were held on school property.

The parties filed cross-motions for summary judgment. The Court rejected Cyr's contention that under the "experience and logic" test, he possessed a First Amendment right of access to a school board meeting, noting that "it is not the 'experience' of the United States that municipal government meetings have been held presumptively open to the public." *Cyr*, 60 F.Supp.3d at 546.

Mr. Cyr, however, also argued that the notices against trespass violated his First Amendment right to free expression by preventing him from physically attending School Board meetings. With respect to this contention, the Court found the restrictions applicable to government regulation of speech in a designated public forum, "a place not traditionally open to assembly and debate which 'the State has opened for use by the public as a place of expressive activity'" were "subject to the same limitations that govern a traditional public

forum." *Id.* "Thus, the government may impose content-neutral time, place, and manner

restrictions on speech within the designated category for which the forum has been opened

so long as those restrictions are 'narrowly tailored to serve a significant government interest

and leave open ample alternative channels of communications.'" *Id.* at 547.

The Court found the notices against trespass issued against Mr. Cyr "restrict his

speech at school board meetings, which occur on ARSU property. School board meetings

are limited public fora." *Id.*

The Court also held that the "categorical ban" on Cyr's attendance at School Board

meetings was not "narrowly tailored" and did not "leave open ample alternative channels of

communication":

> Protecting the safety of school staff is undoubtedly a significant government
> interest. *See Lovern v. Edwards*, 190 F.3d 648, 655-56 (4th Cir. 1999)
> (school officials have discretion to remove parents from school property in
> response to a threat of disruption). A categorical ban of a single individual
> from open school board meetings, however, is not narrowly tailored and does
> not leave open ample alternative channels of communication.

*Id.* at 548.

The Court explained its determination, proceeding through an analysis based upon

the four criteria which determine the legality of any restriction as to time, place, and manner

of speech in a public forum or limited public forum as stated in *Eichenlaub, supra,* at 280.

The Court stated that "a categorical ban on speech is not tailored at all, as it entirely

forecloses a means of communication." *Cyr*, 60 F.Supp.3d at 548. The categorical ban on

Cyr's speech was deemed to run afoul of the requirement that:

In order to be narrowly tailored, a time, place, or manner restriction must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward* [*v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed. 2d 661 (1989)]. Here, ostensibly in order to protect school staff, Mr. Cyr was banned not only from the Benson school grounds, but from all premises owned by the ARSU. He was not banned only during regular school hours, but at all hours for two years.

*Id.*

The Court found that "a notice against trespass targeting an individual rather than the public generally is equivalent to an injunction against speech and the Supreme Court has explained, '[i]njunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances.'" *Id.* (quoting *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994)).

The categorical ban on Cyr "was not tailored to respond to the specific threat Mr. Cyr potentially posed, a threat that was never articulated as anything more specific than 'a potential risk of violence to [Principal Doty, Director Benway,] or their staff.'" *Id.* The Court expressed its view that if the goal in issuing a notice against trespass to Mr. Cyr was to protect school staff, "then it could have drafted a Notice Against Trespass that was in effect only during school hours or posted a police officer at public meetings held on ARSU grounds. Also, the ARSU could have moved school board meetings to a neutral and secure location." *Id.* at 548-549.

Relying upon the decision in *Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005), the

Court found that "a categorical ban on expressive speech singling out an individual does not

even satisfy the lower threshold of reasonableness review." *Id.* at 549.

In *Huminski*, the plaintiff was prohibited from appearing in or around Vermont state

Court facilities or grounds. He brought suit alleging violations of the First and Fourth

Amendments. The Court of Appeals found the notices against trespass to be an

unreasonable restriction on Huminski's expressive activity in a non-public forum:

> The Notices Against Trespass in effect prohibit indefinitely any and all
> expressive activity in which Huminski might want to engage in and around
> Rutland state courthouses. These notices are thus pervasive enough to be
> viewed as creating a "First-Amendment-Free Zone" for Huminski alone in and
> around the Rutland courts. The defendants' singling out of Huminski for
> exclusion, thereby permitting all others to engage in similar activity in and
> around the courts, suggests to us that the trespass notices are not
> reasonable. Such broad restrictions are generally frowned upon even in
> nonpublic forums.

*Huminski*, 396 F.3d at 92-03.

After relying on *Huminski*, the Court in *Cyr* then decided that the ARSU failed to

provide Mr. Cyr with adequate alternative channels of communication. The Court

specifically found that Cyr's participation in School Board meetings by telephone would not

provide an adequate alternative.

> As an initial matter, the ARSU fails to consider the nature of a school board
> meeting. The "intended audience of those participating and speaking at a
> [school board] meeting is not isolated to district personnel," but includes
> community members as well. [Citation omitted] Participating by telephone
> would have substantially diminished Mr. Cyr's ability to communicate not only
> with the school board, but with community members. *See Bay Area Peace*

24

*Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) ("[A]n alternative mode of communication may be constitutionally inadequate if the speaker's 'ability to communicate effectively is threatened.'") (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). Furthermore, his speech may not have had the same effect on the school board or other members in attendance at school board meetings were he not physically present. *See City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) ("regulation of a medium inevitably affects communication itself"); *Kleindienst v. Mandel*, 408 U.S. 753, 765, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (stating the argument that technological developments such as "tapes or telephone hook-ups" are effective substitutes for physical presence "overlooks what may be particular qualities inherent in sustained, face-to-face debate, discussion and questioning") . . . .

*Cyr*, 60 F.Supp.3d at 549.

The Court in *Cyr* concluded:

Furthermore, physical participation in open school board meetings is a form of local governance, and to the extent that Mr. Cyr cannot be present at these meetings to communicate directly with elected officials, his First Amendment right of free expression is violated.

*Id*. at 550.

The decisions in *Huminski*, finding unlawful notices of trespass which prohibited

"indefinitely" First Amendment protected expressive activity, and in *Cyr*, which likewise

presented a categorical ban of the Plaintiff from attendance at school board meetings or

entering upon school grounds for a period of two years, strongly suggest that the permanent

ban imposed upon Barna is unlawful. The ban is not narrowly tailored to serve the

significant governmental interest that the Panther Valley School Board has in avoiding the

disruption of its meetings and does not allow Barna an adequate alternative channeled

communication. The decision in *Cyr* which rejected telephonic participation in a school

board meeting as inadequate, a conclusion accepted by this Court, shows the School

Board's offer to respond to Barna's written communications to be wholly inadequate. Barna

would have no opportunity to participate in the School Board meeting in a meaningful way,

given that the School Board, like any deliberative body, makes school policy based on the

discussions which take place at the school board meeting.[2]  Barna's ability to effectively

question members of the Board or the administration on such matters as well as to

comment on actions taken at these meetings are foreclosed by this restriction to letter

writing.

The other courts which have confronted similar bans on attendance at public

meetings and bans on speech at such meetings have found such bans to be unlawful.

Thus, in *Brown v. City of Jacksonville*, 2006 WL 385085 (M.D.Fla. 2006) the Court granted

the motion for a preliminary injunction of the Plaintiff who had been barred from attending

City Council meetings and City Council Committee meetings for seven City Council cycles.

The Court noted that Plaintiff Brown "was effectively prohibited from attending or speaking

at City Council meetings and City Council Committee meetings for almost three months."

2006 WL 385085, at *1.  The ban was imposed because the Plaintiff had not observed the

rules of the Council when making her remarks at a Council meeting.  The Council President

instructed that her microphone be turned off and that she be escorted from the chambers.

---

[2] *See* 65 Pa.C.S.A. § 704 ("Official action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under section 707 (relating to exceptions to open meetings), 708 (relating to executive sessions) or 712 (relating to General Assembly meetings covered)").

Plaintiff made a second request to make further public comments which was refused by the

Council President. Plaintiff then proceeded toward the lectern despite having been refused

in her second request to make comments. When the Sergeant at Arms approached Plaintiff

at the lectern and grasped her arm, she swung her arm and he fell to the floor. A number of

officers restrained the Plaintiff and removed her from City Council chambers. She was

subsequently charged with resisting an officer without violence and disturbing a lawful

assembly. *Id.*

The speech undertaken by Brown was found by the Court to be undoubtedly political

speech deserving of broad First Amendment protection. *Id.* In granting preliminary

injunctive relief to the Plaintiff, the Court noted that the City Council's rule, which permitted

barring any person not a council member who makes "personal, impertinent or slanderous

remarks or who shall become boisterous" was content neutral. *Id.* at *2.

> Mr. Hyde's action of throwing Plaintiff out of the meeting on November 22,
> 2005 apparently resulted from the Plaintiff's disruptive conduct and her failure
> to adhere to the agenda item under discussion, rather than a disapproval of
> her message or viewpoint.

*Id.* at *3. The Court found that the Council rule authorizing Mr. Hyde's expulsion of the

Plaintiff due to her behavior was not unconstitutional on its face but noted: "the City went

beyond expelling her from the single meeting at which she was disruptive." *Id.*

The Court emphasized that Council President Hyde "had a significant governmental

interest in managing an efficient Council meeting agenda, in conserving time, in ensuring

that others had an opportunity to speak, and in preventing the Plaintiff's disruption, and thus

in having her removed from the meeting as a reasonable attempt to regulate the time, place

and manner of the Plaintiff's speech." *Brown*, 2006 WL 385085, at *3.

> A presiding officer at a meeting has the authority to maintain order and keep
> debate to the topic at hand: "To hold otherwise -- to deny the presiding officer
> the authority to regulate irrelevant debate and disruptive behavior at a public
> meeting -- would cause such meetings to drag on interminably, and deny
> others the opportunity to voice their opinions." Such reasons for her removal
> from the November 22, 2005 meeting properly served a sufficiently significant
> governmental interest that justified banning her from that particular meeting.

*Id.* (internal citation omitted).

However, the Court did not find the City Council's ban of the Plaintiff for seven future

cycles of Council meetings to be lawful:

> Nevertheless, the Court finds that there is a substantial likelihood that Plaintiff
> will succeed in her claim that the City's directive banning her from seven
> future cycles of Council meetings is unconstitutional as applied to Plaintiff
> Brown. Banning Plaintiff from future meetings is not a restriction that is
> "narrowly tailored" to achieve the significant governmental interest of running
> the meetings efficiently, while successfully preventing her disruptive behavior.
> Although the City does not have to use the "most appropriate method" of
> restricting the Plaintiff, it should nonetheless use a directive that is more
> "narrowly tailored" than a sweeping ban from future meetings for months.

*Id.* at *4. Further, the Court found that banning the Plaintiff from future Council meetings

"does not leave her with an 'ample alternative channel of communication.'" *Id.*

The Court in *Brown* rejected the City's directive which allowed the Plaintiff to

communicate with the City Council through e-mails or letters or have her messages

delivered to the Council by other persons. The Court determined that "such alternative

channels do not amount to 'ample' alternatives that would be comparable to the same

degree as her own passionate deliverance of her messages in person at the meetings, to

the entire council or an entire council committee meeting, at the same time." *Id*.

Accordingly, the Court concluded:

> Because the two requirements (of narrow tailoring and of an ample alternative
> channel of communication) are lacking, the City's content-neutral restriction,
> and the Council Rule as applied, are substantially likely to be found as a
> violation of her First Amendment rights.

*Id*.

Lastly, the Court found that Plaintiff had a substantial likelihood of success on the

merits of her claim that her ban from attendance at meetings for seven cycles was an

unlawful "prior restraint" and an unconstitutional censorship on free speech and assembly.

"A prior restraint of expression 'exists when the government can deny access to a

forum before the expression occurs.'" *Id*. Such a prior restraint of expression carries "a

heavy presumption against its constitutional validity." *Id*. In this connection, the Court

added: "[m]oreover, the government cannot prohibit future expressive activity as a result of

past unlawful conduct. *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d

503, 507 (6th Cir. 2001) ('where a law sets out primarily to arrest the future speech of a

defendant as a result of his past conduct, it operates like a censor, and as such violates

First Amendment protections against prior restraint of speech')." *Id*.

The Court summarized its view of the ban of Plaintiff for seven cycles of future

Council meetings:

> Mr. Hyde's expulsion of the Plaintiff from the November meeting based on
> Council Rule 4.505 is not a question before this Court. The question before
> the Court is whether the directive banning her from seven cycles of future
> Council meetings based on her past conduct is an unconstitutional restriction.
> This Court finds that the directive, as crafted, is an unconstitutional restriction
> and, therefore, the Council Rule 4.505, as applied, violates Plaintiff's First
> Amendment protection against prior restraint of free speech.

*Id.*

In another school case, *Stevens v. School City of Hobart*, 2015 WL 4870789 (N.D.

Ind. 2015), the Plaintiff resigned from his job at Defendant School City of Hobart after he

was accused of child molestation by a former student. After his resignation, the Plaintiff was

informed that he should refrain from entering on school property and that it would be

considered trespass for him to do so without permission. Plaintiff expressed a desire to

attend School Board meetings and to attend school events, requests that were refused

because of the accusations of child molestation made against the Plaintiff and because the

younger brother of the maker of those accusations was, for some period of time, a student

at the school. 2015 WL 4870789, at *2-5.

Plaintiff's Complaint contained 11 counts including a count requesting injunctive

relief through an order directing the school to allow Plaintiff to enter on school grounds. *Id.*

at *4. Defendants moved for summary judgment in the District Court and Plaintiff moved for

partial summary judgment.

In considering the Plaintiff's contention that his ban from school property violated his

First and Fourteenth Amendment rights, the Court held that School Board meetings are

"limited public forums, a subset of designated public forums." *Id.* at *14. The Court further

found that the ban imposed upon the Plaintiff was "content neutral – it prohibits Plaintiff from

coming onto school property because of the distraction he might bring not because of what

he will say. The Government may thus 'regulate the time, place and manner of expression

which is narrowly-tailored to serve a significant government interest and leave open ample

alternative channels of communication.'" *Id.*

Nonetheless, the Court found the outright ban imposed upon the Plaintiff to be

insufficiently tailored to grant the Defendants' summary judgment motion:

> Keeping order on School property is a significant state interest. But an
> outright ban is not narrowly tailored to achieve that interest; indeed, "a
> categorical ban on speech is not tailored at all, as it entirely forecloses a
> means of communication." *Cyr*, 60 F.Supp.3d at 548 (citing *Hill v. Colorado*,
> 530 U.S. 703, 704, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)). And it is far
> from clear that the evidence presented by Defendants how order is protected
> by keeping Plaintiff off of the property at (almost) all times. As Defendants
> point out, Plaintiff has twice gotten permission to come onto school property:
> once to vote and another time to attend his niece's graduation. But these
> exceptions are not governed by anything but discretion. Moreover, there is
> no evidence that there are adequate alternative channels open to Plaintiff.
> *See Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1063 (7th Cir.
> 2004). Summary judgment is therefore unwarranted as to the First
> Amendment claim insofar as he alleges that he has been banned from
> attending school board meetings.

*Id.*

The cases that have considered challenges to the imposition on an individual, such

as Barna herein, of a ban on attendance and speech at meetings of a school board, city

council, or other limited public fora, as well as an accompanying ban on the entry upon the

premises of these governmental entities, have found that such outright, content neutral bans and prohibitions on speech and attendance that are directed at and prohibit future expressive activity are unlawful. Thus, the ban in *Brown* of the Plaintiff for seven consecutive cycles of the Jacksonville City Council meetings, the two year ban in *Cyr* of the Plaintiff from School Board meetings, and the "indefinite" ban of the Plaintiff from all state courthouses in and around Rutland in *Huminski*, were each found to be violative of the banned individuals' First Amendment right of expression. In each case, the categorical ban on speech, together with its application to future expressive activity doomed the attempts of the government entity to silence the individual at whom it was aimed. Certainly, if prohibitions on future expressive activity of seven consecutive cycles of meetings (three months) in *Brown*, for two years as in *Cyr*, and a ban of an indefinite period in *Huminski*, violate the First Amendment, then it follows inexorably that a permanent ban on future expressive activity by logical extension, must also be invalidated.

The alternative means of communication in this case, i.e., the offer to Barna to place his questions in writing to the School Board for a response by the School Superintendent present a wholly insufficient substitute for speech at a School Board meeting. The Court in *Cyr* rejected telephonic participation as an inadequate alternative for the Plaintiff's presence at the meeting of the School Board, reasoning that "[p]articipating by telephone would have substantially diminished Mr. Cyr's ability to communicate not only with the school board, but with community members." 60 F.Supp.3d at 549. Barna's ability to communicate effectively

by the alternative mode of communication offered by the School Board is entirely undermined, a result rendering the alternative mode of communication inadequate. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate.") (internal citation omitted). Similarly, in *Brown*, the council's directive to the Plaintiff that she was restricted to communicating with counsel through e-mail or letter or by messages delivered by other persons was rejected as an inadequate alternative to "her own passionate deliverance of her messages in person at the meetings, to the entire council or an entire council committee meeting, at the same time." 2006 W.L. 385085, at *4.

The alternative means of communication rejected in these cases persuasively establish that the Panther Valley School Board's restriction of Barna to the writing of letters for all future expressive activity must be rejected as inadequate.

For all of these reasons, the Court finds that, while the Defendants had ample justification to remove Barna based on his obstreperous and disruptive conduct at the October 13, 2011 meeting as well as at prior meetings of the Panther Valley School Board, they violated Barna's rights under the First Amendment when they imposed a permanent ban on Barna from speaking at or attending School Board meetings of the Panther Valley School District.

However, the Court's inquiry may not end here. The Defendants have sought

qualified immunity for their actions taken against Barna, a subject which will next be

addressed.

## B. The Defendants are Entitled to Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Pearson v.*

*Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity

serves the dual purpose of holding government officials accountable when their power is

exercised unreasonably and protecting those officials from "harassment, distraction, and

liability when they perform their duties reasonably." *Id.* "[Q]ualified immunity applies

regardless of whether the government official's error is 'a mistake of law, a mistake of fact,

or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540

U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Kennedy, J., dissenting)).

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the

Supreme Court articulated a two-step test to determine the appropriate application of

qualified immunity. A Court must decide: (1) whether the facts alleged or shown by the

plaintiff demonstrate the violation of a constitutional right; and (2) if so, whether that right

was "clearly established" at the time of the alleged violation. *Id.* at 201. Qualified immunity

attaches unless the official's conduct violated such a clearly established right. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). However, the *Saucier* procedure which erected a rigid framework no longer mandates that district courts decide the two prongs in any particular order. *Pearson*, 555 U.S. at 236. The decision is left to the discretion of the District Court. *Id*.

"Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) (citing *Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (qualified immunity may turn on disputed issues of fact); *Kames v.Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995) ("While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination.").

The Supreme Court, in *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) provided guidance with respect to how qualified immunity is to be determined. Quoting its prior decision in *Anderson v. Creighton, supra* at 639, the Court observed that whether a government official is protected by qualified immunity "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." 526 U.S. at 614.

The Court then elaborated:

> In *Anderson*, we explained that what 'clearly established' means in this context depends largely "upon the level of generality at which the relevant

> 'legal rule' is to be identified." 43 U.S. at 639, 107 S.Ct. 3034. "[C]learly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.*, at 640, 107 S.Ct. 3034 (citations omitted); *see also United States v. Lanier*, 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

*Id.* at 614-615. The Court emphasized, again citing its decision in *Anderson*, *supra* at 641, that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id.* at 615.

In *Wilson*, homeowners brought suit against federal law enforcement officers under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and against state law enforcement officers under § 1983, asserting that the officers' actions in bringing members of the media into the homeowners' homes to observe and record attempted executions of arrest warrants violated the homeowners' Fourth Amendment rights. The Supreme Court held that bringing reporters into the Plaintiffs' home during an attempted execution of a warrant violated the Fourth Amendment but granted the officers qualified immunity.

The Court found qualified immunity appropriate in *Wilson* for a number of reasons. First it noted that "in 1992 there were no judicial opinions holding that this practice ["media ride-alongs"] became unlawful when it entered a home." 526 U.S. at 616. It also noted that other than a state intermediate court decision which did not engage in an extensive Fourth

Amendment analysis, the parties had identified only two unpublished District Court

decisions dealing with media entering into homes, "each of which upheld the search on

unorthodox non-Fourth Amendment right to privacy theories." *Id.* These cases, the Court

stated, "cannot 'clearly establish' that media entry into homes during a policy ride-along

violates the Fourth Amendment." *Id.* Second, the Court focused on the absence of cases

of controlling authority in the petitioner's jurisdiction:

> Petitioners have not brought to our attention any cases of controlling authority
> in their jurisdiction at the time of the incident which clearly established the rule
> on which they seek to rely, nor have they identified a consensus of cases of
> persuasive authority such that a reasonable officer could not have believed
> that his actions were lawful.

*Id.* at 617.

In the case now before this Court, there were no "cases of controlling authority"

within the Third Circuit at the time of the events which gave rise to Barna's lawsuit which

clearly established a rule that a permanent ban on attendance in speaking at school board

meetings in response to disruptive and arguably threatening behavior at such meetings was

clearly unlawful. To be sure, the decision in *Eichenlaub*, *supra*, establishes the right of a

public entity to remove a person from a public meeting for violating content neutral, time,

place and manner regulations. However, neither *Eichenlaub* nor *Galena* addresses whether

such a removal may be made permanent, even with the availability of an adequate

alternative means of communication having been offered. Nor does the decision in *Olasz*,

*supra*, go beyond establishing the right of local government officials to enforce appropriate

time, place and manner regulations to constrain in that case, a councilman's badgering, disruptiveness and disregard for the rules of decorum.

While this Court has identified several out-of-circuit cases which it finds to be persuasive authority for the proposition that a reasonable school board member could not have believed that the permanent ban on future expressive activity by Barna was lawful or that the alternative means of communication accorded him was sufficient, *see Cyr, Huminski, Brown,* and *Stevens, supra,* it is not clear that there was established a "consensus" of cases at the time of the imposition of the ban on Barna sufficient to deny the Defendants qualified immunity.

The grant of qualified immunity in this case is buttressed by the Supreme Court's recent decision in *Taylor v. Barkes,* --- U.S. ---, 135 S.Ct. 2042, 192 L.Ed.2d 78 (2015). In *Barkes,* the widow of a deceased inmate brought suit under § 1983 against the Commissioner of the State Department of Corrections and Warden, alleging that they had violated the Eighth Amendment in failing to prevent the inmate's suicide. The District Court denied the Commissioner's and Warden's motion for summary judgment based on qualified immunity. The Court of Appeals for the Third Circuit affirmed.

The Supreme Court reversed, holding that the Commissioner and Warden were entitled to qualified immunity because a right to the implementation of adequate suicide prevention protocols was not clearly established. In so holding, the Court in *Taylor,* relying upon its prior decision in *Ashcroft v. Al-Kidd,* 563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d

1149 (2011), presented a test for determining qualified immunity which, in this case,

warrants a grant of such immunity to the current defendants:

> "Qualified immunity shields government officials from civil damages liability
> unless the official violated a statutory or constitutional right that was clearly
> established at the time of the challenged conduct." *Reichle v. Howards*, 566
> U.S. ---, ---, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). "To be clearly
> established, a right must be sufficiently clear that every reasonable official
> would have understood that what he is doing violates that right." *Ibid.*
> (brackets and internal quotation marks omitted). "When properly applied,
> [qualified immunity] protects all but the plainly incompetent or those who
> knowingly violate the law." *Ashcroft v. Al-Kidd*, 563 U.S. ---, ---, 131 S.Ct.
> 2074, 2085, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted). "We
> do not require a case directly on point, but existing precedent must have
> placed the statutory or constitutional question beyond debate." *Id.*, at ---, 131
> S.Ct., at 2083.

135 S.Ct. at 2044.

In the present case, can it be said that "existing precedent" placed the issue of a

permanent ban from attendance and speaking at a public school board meeting beyond

debate?  Is there a set of circumstances such as where the past violent and disruptive

conduct of an individual, combined with statements that unrepentantly vow to do violence at

future public meetings, could justify the exclusion of the individual from those meetings?

And, if so, to what alternative means of communication is that person entitled?  These

questions have not been definitively ruled upon, making the grant of qualified immunity in

this case the appropriate response to the violation of John Barna's constitutional rights

committed by the School Board in an unsettled area of the law.

The proposition that for the constitutional or statutory right to be considered "clearly established", thus defeating qualified immunity, there must be authority stated at a sufficiently high level that is specific enough to put a reasonable official on notice that the conduct is unlawful, was recently reiterated in *Vincent v. City of Sulphur*, --- F.3d. ---, 2015 WL 6688006 (5th Cir. 2015).

In *Vincent*, the Plaintiff was involved in an altercation at a bank wherein he allegedly "threatened to get a gun and kill" the Mayor of the city and a city councilman. Vincent was later questioned about the incident by the sheriff's office and denied the allegations. Two days later, a police officer pulled Plaintiff over and informed him that he was "prohibited from entering onto certain city property" which Plaintiff understood to encompass "'city hall,' 'old city hall,' 'city council chambers/building,' 'city of sulphur city council meetings,' 'city of Sulphur police station,' 'city of sulphur court house,' 'city of Sulphur business center across from the new city hall,' 'West Calcasieu business center,' and 'ward 4 marshal's office'" but not the "public thoroughfares and right-of-ways." 2015 WL 6688006, at *1. In response to Vincent's request why the no-trespass order had been issued, the Police Chief informed him that "the order was to prevent [him] from coming into contact with the two individuals that he had allegedly threatened." *Id.* When the District Attorney advised the Police Chief that there was insufficient evidence to pursue any charges against Vincent, the Police Chief sent a letter to Vincent informing him that the no-trespass order had been terminated. *Id.* at *2.

Vincent filed suit against the City, the Police Chief, and two police officers under §

1983 alleging violations of his rights under the First, Fourth, and Fourteenth Amendments.

Defendants moved for summary judgment on the basis of qualified immunity.

The District Court held that the officers were entitled to qualified immunity as to the

majority of Plaintiff's claims, including his First Amendment claim, but denied qualified

immunity on Vincent's procedural-due-process and direct-municipal-liability claims. *Vincent*

*v. City of Sulphur*, 28 F.Supp.3d 651 (W.D. La. 2014). The District Court found the official

notice of trespass warning was not "reasonable" and observed that a "notice of trespass is

more akin to an injunction then a general ordinance, and therefore requires a 'somewhat

more stringent application of general First Amendment principles.'" *Id.* at 656.

The Court explained that:

> Vincent was not only banned from the private areas of city hall, he was
> banned from the public areas of city hall, the courthouse, the police station
> and the city business center. Vincent was singled out and prohibited from
> any First Amendment activity he might choose to engage at these locations.
> Even if a notice of trespass was reasonable with respect to city hall for the
> protection of a city council member and the mayor, there is no indication that
> those individuals could be found at the courthouse, the police station, or the
> city business center. Even for non-public forums, these broad restrictions are
> disfavored.[3]

*Id.* at 657. The Court then determined whether a grant of qualified immunity was

appropriate. First it offered that the Supreme Court in *Board of Airport Commissioners*, 482

U.S. 569, 575, 107 S.Ct. 2568, 96 L.Ed 2d 500 (1987) had "thought that it was 'obvious' that

---

[3] Earlier in its opinion the District Court had noted that "whether limited or non-public, the standard of review for these forums is the same." 28 F.Supp. 3d at 656.

'no conceivable governmental interest would justify an absolute prohibition of speech' even

in a nonpublic forum." *Id.* at 658. But the Court also explained that the Court of Appeals for

the Fifth Circuit had interpreted a decision of the Supreme Court in *U.S. Postal Service v.*

*Council of Greenburgh Civic Associations*, 453 U.S. 114, 132, 101 S.Ct. 2676, 69 L.Ed 2d

517 (1981), as standing for the proposition that "a complete ban on free expression may be

imposed in a non-public forum if the prohibition is reasonable and content neutral." *Id.*

The District Court concluded that these cases "call[ed] into question whether or not it

may ever be considered reasonable to completely ban the First Amendment activities of an

individual in a nonpublic forum." *Id.* The Court concluded:

> Because it cannot be said that every reasonable officer would have known
> that banning Vincent from City property after receiving information about a
> potential threat was unreasonable, the individual defendants are entitled to
> qualified immunity on this issue.

28 F.Supp.3d at 658.

Following the District Court's decision, the Defendants in *Vincent* appealed the

Court's denial of qualified immunity with respect to Plaintiff's Fourteenth Amendment claims.

In determining whether "the cases cited by the district court place beyond reasonable

debate the proposition that a person under criminal investigation for threatening to kill city

officials has a procedural-due-process right under *Eldridge[4]* to receive notice and an

opportunity to be heard before a ban on entering city buildings goes into effect", the Circuit

recognized:

---

[4] *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Although a case *directly* on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful. [Citation omitted]. Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right "clearly" in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case. *See Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

2015 WL 6688006, at *3 (emphasis in original). With this standard in mind, the Circuit found

that the lower court's cited cases "do not reflect clearly established law in this circuit under

these facts." *Id.* at *4. Rather,

[a]lthough the Supreme Court decisions amply support the proposition that there is a general right to go to or remain on public property for lawful purposes, none comes near the level of specificity needed to put "beyond debate" the related but distinct proposition that a person under investigation for threatening deadly violence against city officials has a right to notice and a hearing before being banned from entering city buildings.

*Id.* The Circuit Court thus reversed the lower court's decision and remanded it for further

proceedings as necessary.[5] *Id.* at *8.

The decision by the District Court in *Vincent,* and the Circuit's subsequent reiteration

of the law with respect to qualified immunity, underscore the unsettled nature of the law with

respect to the legality of a complete ban on First Amendment activities under the standard

applicable to both limited public and non-public fora, the standard for evaluating restrictions

on expressive activity being identical for both.

---

[5] The Fifth Circuit did not address the District Court's grant of qualified immunity to Defendants on Plaintiff's First and Fourth Amendment claims as these issues were not raised on appeal. Therefore, although the District Court's decision was reversed, its reasoning and ultimate holding with respect to Plaintiff's First Amendment claim remains persuasive authority.

In granting Defendants qualified immunity in the present case, this Court is cognizant

of the fundamental importance of the First Amendment.

> The general proposition that freedom of expression upon public questions is
> secured by the First Amendment has long been settled by our decisions. The
> constitutional safeguard, we have said, 'was fashioned to assure unfettered
> interchange of ideas for the bringing about of political and social changes
> desired by the people.' 'The maintenance of the opportunity for free political
> discussion to the end that government may be responsive to the will of the
> people and that changes may be obtained by lawful means, an opportunity
> essential to the security of the Republic, is a fundamental principle of our
> constitutional system.' '[I]t is a prized American privilege to speak one's mind,
> although not always with perfect good taste, on all public institutions' and this
> opportunity is to be afforded for 'vigorous advocacy' no less than 'abstract
> discussion.'

*New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)

(internal citations omitted).

The Court in *Sullivan* spoke of a "profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open, and that it may well

include vehement, caustic, and sometimes unpleasantly sharp attacks on government and

public officials." *Id.* at 270.

But the task of safeguarding the above quoted principles, while allowing content

neutral restrictions on time, place and manner of speech, is a difficult one. Here, Mr.

Barna's consistently obstreperous conduct at Panther Valley School Board meetings may

well have led the School Board Directors to conclude in good faith that nothing short of a

permanent ban on his attendance at those meetings would prevent his threats and

disruptive behavior. While such a permanent ban has been determined by this Court to be

unlawful, as a violation of Barna's First Amendment rights, this Court cannot say that Barna's right to be free of a permanent ban from attendance at school board meetings was, at the time of the events in question, so clearly established by then-existing precedent that it was beyond debate.

## V. CONCLUSION

For all of the foregoing reasons, the Court will grant the Defendants' motion for summary judgment and enter judgment in favor of the Defendants on the basis of qualified immunity. The Court will thus deny Plaintiff's motion for summary judgment.

A separate Order follows.

Robert D. Mariani
United States District Judge

45